Robert A. Henry (#015104)
Matthew P. Fischer (#019770)
Matt Jarvey (#031350)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: (602) 382-6000
Facsimile: (602) 382-6070
E-Mail: bhenry@swlaw.com
        mfischer@swlaw.com
        mjarvey@swlaw.com

*Attorneys for Plaintiff GPMI, Co.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GPMI, Co., | No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Michelin Lifestyle Ltd., and Michelin North America, Inc., | Jury Trial Demanded |
| Defendants. | |

Plaintiff GPMI, Co. ("GPMI") pleads the following in support of its Complaint against Defendants Michelin Lifestyle Ltd. ("MLL") and Michelin North America, Inc. ("MNA"):

**INTRODUCTION**

1. This is a breach-of-contract and tortious-interference case. In 2017, GPMI entered into a contract with MLL to develop, manufacture, distribute, and sell an automotive tire sealant under the Michelin brand name. GPMI and MLL ultimately created a final product pursuant to that contract, but just after GPMI began distributing and selling the product with MLL's approval, MLL and MNA teamed up and thwarted GPMI's ability to proceed.

2. Without justification, MLL revoked approval for GPMI to distribute and sell the product. MLL and MNA then embarked on a scheme of deception and delay, forcing GPMI to jump through meaningless and costly logistical hoops under false pretenses, ostensibly to get the product re-approved for distribution and sale. In reality, however, MLL's and MNA's scheme was a ploy to place GPMI in a position of financial duress so that GPMI would acquiesce to a "renegotiated" contract that was less favorable to GPMI, or to surreptitiously destroy the contract altogether.

3. MLL's and MNA's scheme not only destroyed GPMI's ability to benefit from its contract with MLL, it destroyed other contracts and business opportunities that were dependent on GPMI's ability to distribute and sell the product. As a result, GPMI lost substantial amounts of money in wasted costs and lost profits, among other damages, as detailed below.

## PARTIES, JURISDICITON, AND VENUE

4. GPMI is an Arizona corporation with its principal place of business in Arizona, which makes GPMI a citizen of Arizona.

5. MLL is a public limited company incorporated under the laws of the United Kingdom with its principle place of business in the United Kingdom, which makes MLL a citizen of the United Kingdom.

6. MNA is a New York corporation with its principal place of business in South Carolina, which makes MNA a citizen of New York and South Carolina.

7. This Court has subject matter jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between GPMI on the one hand and MLL and MNA on the other, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to GPMI's claims occurred in the District of Arizona, or alternatively under 28 U.S.C. § 1391(b)(3) because both MLL and MNA are subject to personal jurisdiction in the District of Arizona.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

### MLL Pursues Partnership with GPMI

9. GPMI is in the business of developing, producing, marketing, distributing, and selling consumer products throughout the world—most notably, home cleaning and automotive care products. Part of GPMI's business involves GPMI partnering with other companies and brands to jointly develop products that GPMI then produces, distributes, and sells pursuant to a licensing agreement.

10. MLL is in the business of licensing the Michelin trademark for various consumer products that are then produced and sold under the Michelin brand name.

11. Starting in 2016 and continuing into 2017, GPMI's Chief Operating Officer, Chuck Tornabene ("Mr. Tornabene") entered into discussions with MLL about the potential for both companies to jointly develop and market consumer products under the Michelin brand name.

12. MLL was interested in the opportunity and began to investigate the potential of partnering with GPMI. MLL sent a representative, Tom Jupena ("Mr. Jupena"), to GPMI's facilities in Arizona for purposes of vetting the opportunity to partner with GPMI. On behalf of MLL, Mr. Jupena inspected GPMI's facilities and met with GPMI's leadership including GPMI's President, Yarron Bendor ("Mr. Bendor"). Upon vetting GPMI, Mr. Jupena expressed that he was glad he had visited GPMI and that MLL wanted to move forward and work with GPMI on developing products.

13. In particular, MLL wanted to leverage GPMI's expertise in developing and distributing consumer products via GPMI's manufacturing and distribution channels, which GPMI had developed over decades in the consumer-products business.

### GPMI and MLL Enter into the Agreement

14. On June 15, 2017, GPMI and MLL entered into a contract, called the License Agreement in Relation to Michelin Trade Marks (the "Agreement"), a true and correct copy of which is attached to this Complaint as Exhibit A.

15.     Generally speaking, the Agreement contemplated that GPMI would produce and distribute an automotive product branded with the Michelin trademark in exchange for GPMI making royalty payments to MLL.

16.     Throughout 2017, 2018, and early 2019, GPMI worked collaboratively with MLL to develop a product that could be marketed and sold pursuant to the Agreement. GPMI and MLL explored several product concepts—including an automotive wheel cleaner and tire shine—but ultimately decided to focus on developing a tire sealant (the "Tire Sealant Product"), which was a chemical sealant that a consumer could inject from a cannister into a tire to seal it from leaks.

17.     During the time when the Tire Sealant Product was being developed, several representatives of MLL traveled to Arizona numerous times to meet with GPMI and to work on the product. In fact, most of the meetings between the parties took place in Arizona. The parties never met in the United Kingdom.

18.     The center of economic activity under the Agreement was also in Arizona. Specifically, pursuant to the Agreement, GPMI coordinated and managed the design, manufacturing, and distribution of the Tire Sealant Product from Arizona. The Agreement contemplated that GPMI would earn revenues in Arizona from the sale of the Tire Sealant Product, and make royalty payments to MLL under the Agreement from Arizona. In short, aside from MLL providing the rights to the Michelin brand name, the Agreement contemplated that GPMI in Arizona would operate has the central hub for designing, producing, and bringing the Tire Sealant Product to market.

19.     In developing the Tire Sealant Product, GPMI worked closely with MLL to ensure that the product met each of MLL's requirements, in fact, the product formula was mandated using a third-party formula from Argentina that Michelin used in other parts of the world. GPMI also followed MLL's requirements for the product's label. MLL approved the product's label in mid-2018.

20.     In or around May 2018, representatives of GPMI met with representatives of MLL in Greenville, South Carolina. There, the parties discussed sales projections for the

Tire Sealant Product, as well as advertising and marketing strategies for the Tire Sealant Product.

21. As the Tire Sealant Product was being developed, MLL also helped GPMI to promote and market the Tire Sealant Product at the AAPX trade show in Las Vegas, Nevada. GPMI met with a team from Walmart and discussed the product development at this show.

MLL Approves the Tire Sealant Product

22. After more than a year of GPMI and MLL collaboratively developing the Tire Sealant Product, the parties ultimately created a final version of the product that met MLL's requirements and was ready for full-scale manufacturing and distribution.

23. In February 2019, MLL, via its agents and representatives, gave final written approval, in multiple e-mails, for the product launch and production of the Tire Sealant Product.

24. Upon receiving MLL's written approval, GPMI instructed its third-party manufacturer to begin production of the Tire Sealant Product, and production began immediately thereafter.

Walmart Agrees to Sell the Tire Sealant Product

25. While the Tire Sealant Product was being developed, and leading up to MLL's approval, GPMI entered into discussions with Walmart for Walmart to distribute the Tire Sealant Product in its stores. As a result of these discussions, Walmart agreed to carry and sell the Tire Sealant Product in over 3,800 stores, and to advertise and promote it via special in-store displays.

26. GPMI also began working with Walmart to develop and film a Direct Response Television ("DRTV") campaign—i.e., an infomercial—which would inform viewers that they could buy the Tire Sealant Product at Walmart, but which would also allow viewers to buy the Tire Sealant Product directly from GPMI via the internet and telephone.

27. GPMI was already supplier of other products for Walmart and, thus, already

had a contractual relationship with Walmart via a supplier agreement. Pursuant to that supplier agreement, GPMI and Walmart entered into a specific agreement for Walmart to purchase and stock the Tire Sealant Product (the "Walmart Contract").

28. Pursuant to the Walmart Contract, Walmart placed an initial order with GPMI for the Tire Sealant Product. GPMI fulfilled that order shortly thereafter, at which time Walmart began selling the Tire Sealant Product.

29. Within days of MLL's written approval, and within one day of production beginning, the Tire Sealant Product had shipped to Walmart. By that time, display promotions were already in thousands of Walmart stores and the DRTV campaign was scheduled to start airing shortly.

30. At all relevant times, GPMI kept MLL apprised of its ongoing dealings with Walmart. As a result, at the time GPMI fulfilled its initial order from Walmart, MLL knew about GPMI's plans to distribute the Tire Sealant Product via Walmart and MLL had already approved the Tire Sealant Product.

<u>MLL and MNA Undermine the Agreement</u>

31. Less than two weeks after MLL approved the Tire Sealant Product and Walmart began selling it, MLL revoked its prior approval of the Tire Sealant Product. Specifically, Mr. Jupena—who had previously provided written approval for the Tire Sealant Product—called Mr. Tornabene and instructed GPMI to immediately stop the product launch and production of the Tire Sealant Product.

32. Mr. Jupena indicated that, although MLL was satisfied with the Tire Sealant Product, MNA had inserted itself into the deal and had expressed annoyance that MLL had not involved or consulted MNA in developing the Tire Sealant Product. According to Mr. Jupena, MNA was ostensibly annoyed because it was concerned that a Michelin-branded Tire Sealant Product might negatively affect MNA's tire sales by creating the impression that Michelin tires were defective. As discussed below, however, MNA's ostensible concern was not the true reason for MNA's involvement.

33. Mr. Jupena followed his call with an e-mail to Mr. Tornabene. In the e-mail, Mr. Jupena apologized for news he delivered in his call and acknowledged "the difficult position this puts [GPMI] in."

34. Mr. Jupena then instructed that GPMI must convince Walmart to delay retailing the Tire Sealant Product or to recall the product if it was already being sold. In doing so, he stated, "This is not my decision"—referring to the fact that MNA was driving the decision—but that GPMI's compliance was "necessary for this opportunity to continue."

35. Mr. Tornabene told Mr. Jupena that there was no valid reason to recall the initial batch of Tire Sealant Product from Walmart, and that such a recall would destroy GPMI's contractual relationship with Walmart. Mr. Jupena then ordered GPMI to stop any further production of the Tire Sealant Product and to not fulfill additional orders from Walmart.

36. Once MLL revoked approval for the Tire Sealant Product, GPMI was unable to proceed with manufacturing and distributing the Tire Sealant Product. Pursuant to the Agreement, "[a]ny such product whose approval is revoked shall be deemed unauthorized and shall not be promoted, distributed or sold by or for [GPMI]." Ex. A, Schedule 4, § 5.4.

37. By the time of MLL's revocation, at least 200,000 units of the Tire Sealant Product had already been manufactured, and GPMI had incurred at least $650,000 in manufacturing costs.

38. Mr. Jupena told GPMI that MLL's revocation would last only for an extremely short amount of time, on the order of "a couple days." As discussed below, this was false.

39. Based on MLL's representation that its revocation would be short-lived and MLL's threat that failing to comply with the revocation would end GPMI's opportunity to continue selling the Tire Sealant Product, GPMI reluctantly attempted to work with MLL and MNA to address whatever new purported concerns they raised.

40.     Immediately following MLL's revocation, MNA became heavily involved in communications with GPMI and MLL.  Once MNA got involved, MNA and MLL began presenting GPMI with numerous purported concerns and logistical hurdles related to the Tire Sealant Product, which were presented as conditions that GPMI would have to satisfy for the Tire Sealant to be re-approved.  None of these conditions had been raised before or presented any barrier to MLL's initial approval of the Tire Sealant Product.  In reality, the purported concerns and logistical hurdles were merely MLL's and MNA's attempts to retroactively justify MLL's revocation of approval for the Tire Sealant Product.

41.     For example, MLL and MNA began raising new concerns about the Tire Sealant Product's packaging, including certain regulatory language that was on the Tire Sealant Product's label, and other purportedly desired revisions to the label's language.  This was despite the fact that the Tire Sealant Product's label was a version of Michelin's own label, which GPMI had created *as directed by MLL*, and which MLL had long before approved after its own industry experts and lawyers had reviewed it and after MLL had modified it to its satisfaction.  In fact, GPMI had previously made every change to the label requested by MLL.

42.     In response to MLL's and MNA's new complaints about the label, GPMI retained its own industry experts and lawyers to confirm that the previously approved version of the label complied with applicable regulations.  When GPMI presented information demonstrating the label's validity, MLL and MNA were unable to substantiate their purported concerns.  Still, GPMI continued its attempt to work cooperatively to find solutions to the purported concerns simply to keep the Tire Sealant Product on a path to re-approval.

43.     Eventually, after months of delay, MNA and MLL approved a slightly (but immaterially) revised version of the Tire Sealant Product's label.  Of course, the newly approved label still included Michelin's logo and it was still affixed to a Tire Sealant Product, which demonstrates that MNA's and MLL's original purported reason for

revoking approval for the Tire Sealant Product was false. Even after MLL approved the revised label, it still did not re-approve the Tire Sealant Product for production.

44. After GPMI satisfied the purported concerns about the label, MLL and MNA shifted to raising new purported concerns about the infomercial that GPMI was producing with Walmart. By this time, a script had already been developed, MLL's legal team had already provided its input to the script before MLL's original approval of the Tire Sealant Product, and the infomercial had already been filmed. Now, however, MLL and MNA began demanding additional revisions to the script, many of which would have required the infomercial to be re-filmed. The resulting communications about these new revisions further delayed the re-approval of the Tire Sealant Product. MLL never did approve the infomercial.

45. Without MLL's approval, GPMI was unable to produce a final infomercial for its DRTV campaign. Pursuant to the Agreement, "[GPMI] shall not conduct any advertising, marketing or any other promotional activity related to any Licensed Products and/or any of the Licensed Marks without the prior written approval of [MLL] . . . ." Ex. A, Schedule 4, § 11.6.

46. After forcing GPMI to jump through numerous, meaningless logistical hoops at great cost and with substantial delay, MLL finally revealed its true motivation in revoking approval for the Tire Sealant Product. In a meeting at GPMI's facilities in Arizona, Mr. Jupena gave GPMI an ultimatum: MLL would not approve the infomercial or approve further production of the newly labeled Tire Sealant Product unless GPMI agreed to sign an amended licensing agreement (the "Amended Agreement") with MLL. The proposed Amended Agreement was never executed, but a true and correct copy of it is attached as Exhibit B.

47. The proposed Amended Agreement would have required GPMI to pay MLL drastically higher royalties than the original Agreement. The proposed Amended Agreement also sought to *expand* the number of countries in which the Tire Sealant Product would be sold, which belies the original justification for MLL's revocation.

48. In short, MLL's revocation, and the logistical hoops that followed from both MLL and MNA, were little more than tactics used in an attempt to force GPMI into a position of duress and desperation such that it would acquiesce to a "renegotiated" contract that would be more financially advantageous to MLL. It was, in other words, a shakedown.

49. MLL never re-approved the Tire Sealant Product.

### Walmart Terminates the Walmart Contract

50. While GPMI was working with MLL and MNA in an attempt to get the Tire Sealant Product re-approved, MLL and MNA precluded GPMI from supplying Walmart with additional orders of the Tire Sealant Product. During this time, Walmart was waiting on GPMI to confirm when its informercial would be ready to air and when GPMI would be able to supply additional units of the Tire Sealant Product. Because of MLL's and MNA's actions, GPMI was unable to confirm either.

51. After several months during which GPMI was unable to provide the information Walmart requested, Walmart indicated that it would need to replace GPMI with another supplier.

52. Because GPMI was unable to confirm that it had approval for the informercial or to produce additional units of the Tire Sealant Product, Walmart terminated the Walmart Contract, which effectively ended GPMI's opportunity to distribute the Tire Sealant Product through Walmart.

53. Walmart placed any remaining units of Tire Sealant Product on clearance. Being placed on clearance is, in effect, a death sentence for such products because it signals to the market that the product is not in demand and thus not desirable.

54. At all times, GPMI kept MLL and MNA fully apprised of GPMI's dealings with Walmart, including the Walmart Contract and the assurances that Walmart was seeking. Specifically, GPMI repeatedly told MLL and MNA that Walmart needed assurances that GPMI would be able to resupply Tire Sealant Product, and that delaying the infomercial or delaying re-approval for the Tire Sealant Product would harm GPMI's

relationship with Walmart, the Walmart Contract, and the ability to distribute the Tire Sealant Product through Walmart.

### GPMI is Forced to Renegotiate another Deal with Walmart

55. For over fourteen years, GPMI has been Walmart's supplier of choice for another product: Auto Care Wipes. During those years, GPMI has never had any issues with Walmart related to Auto Care Wipes.

56. As a result of Walmart's dissatisfaction with GPMI related to the Tire Sealant Product, however, Walmart notified GPMI that Walmart intended to use a new supplier for Auto Care Wipes. Upon receiving that notice, GPMI managed to convince Walmart to retain GPMI as the supplier of choice, but only after renegotiating its deal with Walmart in a way that cost GPMI an additional $0.10 per package—which equates to a loss of millions of dollars for GPMI.

### GPMI Suffers Damages

57. As a result of MLL's and MNA's actions, GPMI suffered various forms of damage including without limitation: costs related to product development, manufacturing, advertising, and legal advice; lost profits; and lost goodwill in relation to the products that were the subject of the Agreement and GPMI's other products. GPMI is still in the process of calculating its damages, but GPMI's out-of-pocket cost-related damages alone exceed $2 million.

58. Both MLL and MNA were well aware that their actions caused, and had the potential to cause, damages to GPMI. In fact, less than one month after MLL revoked approval for the Tire Sealant Product, GPMI informed MLL and MNA that their actions had caused, or were about to cause, the types of damages listed above. Despite this, MLL and MNA persisted in their tactics designed to force GPMI into a "renegotiated" Amended Agreement.

59. Both MLL and MNA directed their interference at GPMI. Based on the history of the parties' relationship, detailed above, both MLL and MNA knew that GPMI was an Arizona corporation with its principal place of business in Arizona. Given

GPMI's central role in coordinating the development, manufacturing, and distribution of the Tire Sealant Product, both MLL and MNA knew that Arizona was the central location for the economic activity under the Agreement. Yet MLL and MNA directed their tortious activity and communications toward GPMI in Arizona in an effort to thwart the Agreement. Both MLL and MNA thus targeted their interference toward Arizona by knowingly attempting to thwart an Arizona corporation from bringing to fruition an Agreement the economic activity of which centered in Arizona. Both MLL and MNA also knew that the foreseeable effects of their tortious conduct would be felt in Arizona, where GPMI's business is located and where GPMI would perform its obligations under the Agreement.

## COUNT I

### Breach of Contract (Against MLL)

60. GPMI incorporates all other allegations in this Complaint as if they had been fully set forth herein.

61. The Agreement is a valid, enforceable contract.

62. MLL breached the Agreement by failing to permit GPMI to produce, distribute, and sell a Tire Sealant Product with the Michelin brand name and trademark, as MLL had agreed to do under the Agreement.

63. MLL also breached the Agreement by revoking its approval for the Tire Sealant Product without valid reason, denying re-approval, and preventing GPMI from obtaining re-approval.

64. MLL also breached certain warranties in the Agreement. MLL warranted that it had "full authority to execute and perform this Agreement" and "that the agreement shall not cause [MLL] to be in breach of any obligation to a third party, whether contractual, statutory or otherwise." Ex. A, Schedule 4, § 3.3. Yet MLL permitted MNA to exercise authority over the Agreement, and in turn over MLL and GPMI. To the extent that MLL did not have the requisite authority to enter into the Agreement, or that entering into the Agreement caused MLL to breach some obligation to MNA (or anyone else),

1  MLL breached its warranties under the Agreement.

2  65. MLL had no valid reason under the Agreement to revoke its approval for the
3  Tire Sealant Product, deny re-approval, or prevent GPMI from obtaining re-approval.
4  MLL similarly had no valid reason for allowing MNA to exercise control over the
5  Agreement and over MLL and GPMI.

6  66. As a result of MLL's breaches, GPMI suffered damages in an amount to be
7  determined at trial.

## COUNT II

### Breach of Implied Covenant of Good Faith and Fair Dealing (Against MLL)

67. GPMI incorporates all other allegations in this Complaint as if they had been fully set forth herein.

68. The Agreement contained an implied covenant of good faith and fair dealing, which is implied at law in all contracts. *See Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. App. 2002).

69. "[A] party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Id.* at 435.

70. MLL breached the implied covenant by failing to permit GPMI to produce, distribute, and sell a Tire Sealant Product with the Michelin brand name and trademark, as MLL had agreed to do under the Agreement, and by revoking its approval for the Tire Sealant Product without valid reason, denying re-approval, and preventing GPMI from obtaining re-approval—all of which were inconsistent with GPMI's reasonable expectations and denied GPMI the reasonably expected benefits of its bargain, and all of which were done in an attempt to renegotiate the Agreement on terms more favorable to MLL.

71. As a result of MLL breaching the implied covenant of good faith and fair

dealing, GPMI suffered damages in an amount to be determined at trial.

## COUNT III

### Tortious Interference with Contractual Relations (Against MLL and MNA)

72. GPMI incorporates all other allegations in this Complaint as if they had been fully set forth herein.

73. GPMI had a valid contractual relationship with MLL via the Agreement.

74. GPMI had a valid contractual relationship with Walmart via the Walmart Contract.

75. MLL and MNA both knew about the Agreement and the Walmart Contract.

76. MNA intentionally interfered with the Agreement by inducing MLL to revoke and withhold approval for the Tire Sealant Product, and by forcing GPMI to jump through numerous, meaningless logistical hoops at great cost and with substantial delay, all of which made GPMI's performance under the Agreement more expensive, burdensome, and ultimately impossible.

77. The Agreement did not require approval or permit participation from MNA, and MNA had no right to interfere with GPMI's performance of, or receipt of benefits from, the Agreement, or to induce MLL to revoke or withhold approval for the Tire Sealant Product under the Agreement.

78. MLL and MNA both intentionally interfered with the Walmart Contract by failing to permit GPMI to produce, distribute, and sell a Tire Sealant Product with the Michelin brand name and trademark and intentionally revoking (in the case of MLL) or intentionally inducing revocation (in the case of MNA) of approval for GPMI to produce and distribute the Tire Sealant Product, and by making it impossible for GPMI to achieve re-approval for the Tire Sealant Product, all the while knowing that doing so would prevent GPMI from fulfilling its obligations under the Walmart Contract.

79. As a result of MNA's intentional interference, MLL breached the Agreement.

80. As a result of MLL's and MNA's intentional interference, GPMI could not fulfil its obligations under the Walmart Contract, and Walmart thus terminated that contract.

81. MLL's and MNA's conduct was improper as to both motive and means. MLL and MNA were motivated by a desire to either to force GPMI into a position of duress such that GPMI would acquiesce to a "renegotiated" contract that was less favorable to GPMI, or to surreptitiously destroy the Agreement by making it impossible for GPMI to perform under the Agreement or fulfill other obligations—like the Walmart Contract—that were dependent on the Agreement. In pursuing their scheme, MLL and MNA used tactics of deception and delay, stringing GPMI along with the false hope of re-approval for the Tire Sealant Product and forcing GPMI to jump through costly logistical hoops, only for MLL and MNA later to reveal their true intentions. MLL and MNA used these tactics in an attempt to make the failure of the Agreement or the Walmart Contract look like GPMI's fault (thus sparing MLL or MNA from perceived responsibility), when in reality the failure was orchestrated by MLL and MNA.

82. As a result of MLL's and MNA's tortious interference, GPMI suffered damages in an amount to be determined at trial.

83. Through their tortious conduct, MLL and MNA intended to injure GPMI and consciously pursued a course of conduct knowing that it created a substantial risk of harming GPMI, and GPMI is entitled to punitive damages accordingly.

## COUNT IV

**Tortious Interference with Business Expectancy (Against MLL and MNA)**

84. GPMI incorporates all other allegations in this Complaint as if they had been fully set forth herein.

85. GPMI had several valid business expectancies that were dependent on GPMI's ability to produce and distribute the Tire Sealant Product under the Agreement. Those business expectancies included without limitation:

a. The expectancy that Walmart would continue placing additional orders for the Tire Sealant Product after its initial order under the Walmart Contract;

b. The expectancy that GPMI would have sold the Tire Sealant Product to a class of DRTV customers via GPMI's DRTV infomercial campaign; and

c. The expectancy that GPMI would have sold the Tire Sealant Product via other distributors, including without limitation Advance Auto Parts, AutoZone, and Target. GPMI was already an approved vendor for these distributors and had an ongoing contractual relationship with them. These distributors already purchased and stocked a majority of GPMI's other products in their stores. GPMI had entered into discussions with each of these other distributors to stock the Tire Sealant Product, and each of them expressed interest in stocking the Tire Sealant Product. Based on these discussions and the prior relationships between GPMI and these other distributors, GPMI would have been able to distribute the Tire Sealant product via these other distributors but for MLL and MNA preventing re-approval of the Tire Sealant Product.

86. MLL and MNA knew about these business expectancies because GPMI kept them informed of the expectancies at all relevant times. Moreover, the Agreement expressly contemplated that GPMI would distribute the Tire Sealant Product via such distributors as those listed above and via a DRTV campaign. *See* Ex. A, Schedule 1, § 6.

87. MLL and MNA both intentionally interfered with GPMI's business expectancies by failing to permit GPMI to produce, distribute, and sell a Tire Sealant Product with the Michelin brand name and trademark and intentionally revoking (in the case of MLL) or intentionally inducing revocation (in the case of MNA) of approval for GPMI to produce and distribute the Tire Sealant Product, and by making it impossible for GPMI to achieve re-approval for the Tire Sealant Product, all the while knowing that doing so would prevent GPMI from finalizing the business expectancies that were dependent on the Agreement.

88. As a result of MLL's and MNA's tortious interference, GPMI was unable to realize its business expectancies, all of which were dependent on GPMI's ability to

produce, advertise, distribute, and sell the Tire Sealant Product pursuant to the Agreement. Each of GPMI's business expectancies terminated as a result.

89. MLL's and MNA's conduct was improper as to both motive and means. MLL and MNA were motivated by a desire to either to force GPMI into a position of duress such that GPMI would acquiesce to a "renegotiated" contract that was less favorable to GPMI, or to surreptitiously destroy the Agreement by making it impossible for GPMI to perform under the Agreement or to finalize GPMI's business expectancies that were dependent on the Agreement. In pursuing their scheme, MLL and MNA used tactics of deception and delay, stringing GPMI along with the false hope of re-approval for the Tire Sealant Product and forcing GPMI to jump through costly logistical hoops, only for MLL and MNA later to reveal their true intentions. MLL and MNA used these tactics in an attempt to make the failure of the Agreement look like GPMI's fault (thus sparing MLL or MNA from perceived responsibility), when in reality the failure was orchestrated by MLL and MNA.

90. As a result of MLL's and MNA's tortious interference, GPMI suffered damages in an amount to be determined at trial.

91. Through their tortious conduct, MLL and MNA intended to injure GPMI and consciously pursued a course of conduct knowing that it created a substantial risk of harming GPMI, and GPMI is entitled to punitive damages accordingly.

**PRAYER**

GPMI requests that the Court enter judgment in favor of GPMI and against MLL and MNA, and award the following relief:

A. All damages to which GPMI is entitled, including without limitation compensatory, consequential, and punitive damages;

B. Pre- and post-judgment interest on all applicable damages;

C. Reasonable attorneys' fees, costs, and expenses incurred pursuant to A.R.S. § 12-341.01, 28 U.S.C. § 1920, Rule 54(d), Federal Rules of Civil Procedure, and any other applicable authority; and

D.  Any other relief to which GPMI is entitled or that the Court deems just.

**JURY TRIAL DEMAND**

Pursuant to Rule 38(b)(1), Federal Rules of Civil Procedure, GPMI demands a jury trial on all issues so triable.

DATED this 18th day of February, 2021.

SNELL & WILMER L.L.P.

By: *s/Matt Jarvey*
Robert A. Henry
Matthew P. Fischer
Matt Jarvey
One Arizona Center
400 East Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
*Attorneys for Plaintiff GPMI, Co.*

4827-1313-3524

- 18 -