**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GPMI Company, | No. CV-21-00299-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Michelin Lifestyle Limited, et al., | |
| Defendants. | |

Pending before the Court are Defendant Michelin North America Inc.'s ("MNA") Motion to Dismiss Pursuant to Rule 12(b)(2) for Lack of Personal Jurisdiction (Doc. 27) and Defendant Michelin Lifestyle Limited's ("MLL") Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(5) and on Grounds of Forum Non Conveniens (Doc. 28.) For the following reasons, both motions are granted.[1]

## BACKGROUND

GPMI Company ("Plaintiff") is an Arizona corporation with its principal place of business in Arizona. (Doc. 1 ¶ 4.) Plaintiff partners with other companies to jointly develop products, which it then "produces, distributes, and sells pursuant to a licensing agreement." (Doc. 1 ¶ 9.) MLL is a public limited company incorporated under the laws of the United Kingdom that licenses the Michelin trademark for products which are sold

---

[1] Plaintiff's request for oral argument is denied because the parties have had an adequate opportunity to discuss the law and evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Invs. Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

1 under the Michelin brand name.  (Doc. 1 ¶ 5.)  MNA is a New York corporation with its

2 principal place of business in South Carolina.  (Doc.1 ¶ 6.)

3      In 2016, MLL and Plaintiff's Chief Operating Officer began discussing a possible

4 partnership in which Plaintiff would distribute a Michelin-branded consumer product

5 within the United States.  (Doc. 1 ¶ 11.)  In order to further investigate the opportunity,

6 MLL sent a representative to Arizona to meet with Plaintiff's executives and to tour

7 Plaintiff's facilities.  (Doc. 1 ¶ 12.)

8      In June 2017, Plaintiff and MLL executed a licensing agreement (the "agreement").

9 (Doc. 1 ¶ 14.)  The agreement gave Plaintiff the right to manufacture and distribute

10 Michelin-branded products in the United States, subject to prior approval by MLL, in

11 exchange for annual royalty payments.  (Doc. 1-1 at 5, 8.)  The agreement also granted

12 MLL the "absolute discretion" to revoke any approvals given, at any time, if it determined

13 that "any approved Licensed Product and/or packaging may damage the Licensed Marks

14 or the commercial interests of the Licensor . . . . Any such product whose approval is

15 revoked shall be deemed unauthorized and shall not be promoted, distributed or sold by or

16 for [Plaintiff]."  (Doc. 1-1 at 12.)  The agreement contained (1) a choice-of-law clause

17 specifying that it would be "governed by and interpreted in accordance with English law,"

18 (2) a clause requiring pre-litigation mediation of any dispute "arising out of or in

19 connection with" the agreement at the London Court of International Arbitration, and (3) a

20 clause stating that "each of the Parties hereby submits to the jurisdiction of the competent

21 English courts" for any dispute which "has not been resolved through mediation."  (Doc.

22 1-1 at 28–29.)

23      Over the next year and a half, Plaintiff developed a Michelin-branded tire sealant

24 product in collaboration with MLL.  (Doc. 1 ¶ 16.)  According to the complaint, "several

25 representatives of MLL traveled to Arizona numerous times to meet with [Plaintiff] and to

26 work on the product" during that period.  (Doc. 1 ¶ 17.)  MLL approved the product in

27 February 2019.  (Doc. 1 ¶ 23.)  By then, Plaintiff had entered into an agreement with

28 Walmart to distribute the product in its stores.  (Doc. 1 ¶ 25.)  Shortly after approval, MLL

1    exercised its right under the agreement to revoke approval of the product, and asked

2    Plaintiff to refrain from shipping the product to Walmart for distribution.  (Doc. 1 ¶ 31.)

3         Plaintiff alleges that MLL's revocation was induced by MNA, which had expressed

4    concerns that a Michelin-branded tire sealant product could "negatively affect MNA's tire

5    sales by creating the impression that Michelin tires were defective."  (Doc. 1 ¶ 32.)  This

6    concern was allegedly a cover for MLL and MNA's true motivations: to force Plaintiff to

7    renegotiate the agreement and accept higher royalty fees.  (Doc. 1 ¶¶ 47, 48.)  Plaintiff

8    alleges that both MNA and MLL were aware of GPMI's contract with Walmart to sell the

9    tire sealant.  (Doc. 1 ¶ 54.)  It further alleges that MNA knowingly interfered in its contract

10   with MLL and Walmart and that MLL interfered in its contract with Walmart.  (Doc. 1

11   ¶¶ 75, 76, 78.)   It alleges that both Defendants interfered in its business expectancies to

12   continue selling the tire sealant to Walmart and to begin selling it to other customers.  (Doc.

13   1 ¶ 87.)  It also alleges that:

> Both MLL and MNA directed their interference at GPMI.
> Based on the history of the parties' relationship, . . . both MLL
> and MNA knew that GPMI was an Arizona corporation with
> its principal place of business in Arizona. . . .[B]oth MLL and
> MNA knew that Arizona was the central location for the
> economic activity under the Agreement. . . . Both MLL and
> MNA thus targeted their interference toward Arizona by
> knowingly attempting to thwart an Arizona corporation from
> bringing to fruition an Agreement the economic activity of
> which centered in Arizona.  Both MLL and MNA also knew
> that the foreseeable effects of their tortious conduct would be
> felt in Arizona, where GPMI's business is located and where
> GPMI would perform its obligations under the agreement.

(Doc. 1 at ¶ 59.)

     Plaintiff filed the present Complaint in February 2021, seeking damages on various

theories, including breach of contract (Count I), breach of the implied covenant of good

faith and fair dealing (Count II), tortious interference with contractual relations (Count III),

and tortious interference with business expectancy (Count IV).  Counts I and II are asserted

against MLL only, and Counts III and IV are asserted against both MLL and MNA.  (Doc. 1

at 12–15.)  In response, MNA moved to dismiss for lack of personal jurisdiction (Doc. 27),

and MLL moved to dismiss on several grounds, including lack of personal jurisdiction,

1  forum non conveniens, and improper service of process (Doc. 28.)

2  **DISCUSSION**

3  **I.    MNA's Motion**

4      **A.    Legal Standard**

5         On a motion to dismiss for lack of personal jurisdiction, the plaintiff "bears the

6  burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin*

7  *Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).   "Where, as here, the motion is based on

8  written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima

9  facie showing of jurisdictional facts.'"  *Id.* (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361

10  (9th Cir. 1990)).   While the plaintiff "cannot 'simply rest on the bare allegations of its

11  complaint," *id.* (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th

12  Cir. 1977)), the Court must "take as true all uncontroverted allegations in the complaint."

13  *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101,

14  1106 (9th Cir. 2020).  Allegations that are contradicted by affidavit are not assumed as true,

15  but factual disputes between affidavits are resolved in the plaintiff's favor.  *CollegeSource,*

16  *Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011).

17         The Court applies Arizona law to determine whether it may exercise jurisdiction

18  over a defendant.  *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).  "The Arizona

19  long-arm statute provides for personal jurisdiction co-extensive with the limits of federal

20  due process." *Doe v. Am. Nat. Red Cross*, 112 F.3d 1048, 1050 (9th Cir. 1997); Ariz. R.

21  Civ. P. 4.2(a).  For a court's exercise of personal jurisdiction over a nonresident defendant

22  to comport with due process, "that defendant must have at least 'minimum contacts' with

23  the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions

24  of fair play and substantial justice.'" *Schwarzenegger*, 374 F.3d at 801 (quoting *Int'l Shoe*

25  *Co. v. Washington*, 326 U.S. 310, 316 (1945)).

26         There are two types of personal jurisdiction: general and specific.  *Ford Motor Co.*

27  *v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021).  A defendant is subject to

28  general jurisdiction—and amenable to any suit—if their ties to the forum are "so

- 4 -

1   continuous and systematic as to render [them] essentially at home in the forum state."

2   *Glob. Commodities*, 972 F.3d at 1106.   Specific jurisdiction attaches only if the suit arises

3   out of or relates to the defendant's contacts with the forum.   *Bristol-Myers Squibb Co. v.*

4   *Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017).   When specific jurisdiction is the sole

5   basis for haling an out-of-state defendant into the forum, it must "exist for each claim

6   asserted," *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir.

7   2004), and each defendant.   *Sher*, 911 F.2d at 1365.

8           **B.       Analysis**

9           Plaintiff concedes that MNA, a New York corporation with its principal place of

10  business in South Carolina, is not subject to general jurisdiction in Arizona.   (Doc. 31 at

11  8.)   Therefore, the Court must determine whether it may exercise specific jurisdiction over

12  MNA.

13          The Ninth Circuit uses a three-part test to determine whether specific jurisdiction

14  exists.   "First '[t]he non-resident defendant must purposefully direct his activities or

15  consummate some transaction with the forum or resident thereof; or perform some act by

16  which he purposefully avails himself of the privilege of conducting activities in the forum,

17  thereby invoking the benefits and protections of its laws.'"   *Glob. Commodities*, 972 F.3d

18  at 1107 (quoting *Schwarzenegger*, 374 F.3d at 802).   "Second, the claim must arise out of

19  or relate to the defendant's forum-related activities."   *Id.*   "Finally, the exercise of

20  jurisdiction must be reasonable."   *Id.*

21          The substance of the first element differs depending on the "nature of the claim at

22  issue."   *Picot*, 780 F.3d at 1212.   "A purposeful availment analysis is most often used in

23  suits sounding in contract."   *Schwarzenegger*, 374 F.3d at 802.   "A purposeful direction

24  analysis, on the other hand, is most often used in suits sounding in tort."   *Id.*

25          Because Plaintiff's claims against MNA are intentional torts, the purposeful

26  direction analysis is more appropriate.   (Doc. 1 at 14–15.)   "[A] defendant purposefully

27  direct[s] his activities at the forum if he: '(1) committed an intentional act, (2) expressly

28  aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered

1    in the forum state.'"   *Picot*, 780 F.3d at 1214 (quoting *Schwarzenegger*, 374 F.3d at 803).

2    But "[t]he proper question is not where the plaintiff experienced a particular injury or effect

3    but whether the defendant's conduct connects him to the forum in a meaningful way."

4    *Walden v. Fiore*, 571 U.S. 277, 290 (2014).   Thus, specific jurisdiction cannot be

5    established solely by allegations that "a defendant 'engaged in wrongful conduct targeted

6    at a plaintiff whom the defendant knows to be a resident of the forum state.'" *Axiom Foods,*

7    *Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017) (quoting *Wash. Shoe Co.*

8    *v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 675 (9th Cir. 2012), *abrogated by Walden*, 571

9    U.S. at 290).

10          Plaintiff has adequately alleged that MNA committed an intentional act.   A

11   defendant commits an intentional act when they act with the "intent to perform an actual,

12   physical act in the real world."  *Schwarzenegger*, 374 F.3d at 806.   Plaintiff alleges that

13   MNA caused MLL to revoke its approval of the tire sealant product. (Doc. 1 ¶ 31–34.)  As

14   alleged, MNA committed an intentional act that satisfies the first prong of the effects test.

15          Pertinent to the express aiming requirement, Plaintiff alleges that "[b]oth MLL and

16   MNA directed their interference at [Plaintiff]," and that "both MLL and MNA knew that

17   [Plaintiff] was an Arizona corporation with its principal place of business in Arizona."

18   (Doc. 1 ¶ 59.)   It further alleges that both entities "knew that Arizona was the central

19   location for the economic activity under the Agreement," and that their interference was a

20   knowing attempt "to thwart an Arizona corporation from bringing to fruition an Agreement

21   the economic activity of which centered in Arizona."  (Doc. 1 ¶ 59.)

22          Plaintiff's theory of jurisdiction is inconsistent with the Supreme Court's decision

23   in *Walden*.  571 U.S. at 289.   There, Nevada residents brought a *Bivens* action in Nevada

24   against a federal narcotics agent who seized cash from their luggage in the Atlanta airport

25   and allegedly drafted a false affidavit in Georgia to support a forfeiture action.  *Id.* at 280.

26   The Court held that the Nevada court could not exercise jurisdiction over the agent even

27   though he "allegedly directed his conduct at plaintiffs whom he knew had Nevada

28   connections," because he "never traveled to, conducted activities within, contacted anyone

in, or sent anything or anyone to Nevada." *Id.* at 289.

Post-*Walden* courts tend to decline jurisdiction in intentional interference cases when a plaintiff's only showing of express aiming is that the out-of-state defendant's extra-forum actions caused harm to the plaintiff in the forum state. *See Indie Caps, LLC v. Ackerman*, No. CV-20-1970-PHX-DJH, 2021 WL 2352416, at *1 (D. Ariz. June 9, 2021) (Florida resident and Florida company allegedly persuaded non-Arizona resident to breach contract with Arizona company but otherwise had no contacts with Arizona); *Cayenne Med., Inc. v. Medshape, Inc.*, No. 14-cv-0451-HRH, 2015 WL 5363199, at *3 (D. Ariz. Sept. 15, 2015) (defendants caused several entities to breach their contracts with the plaintiff, but neither the defendants nor the entities were located in Arizona, and the alleged inducement took place outside of Arizona); *Paragon Bioteck, Inc. v. Altaire Pharms., Inc.*, No. 15-cv-189-PK, 2015 WL 4253996, at *8 (D. Or. July 10, 2015) (defendant's alleged conduct consisted of "interfering with [plaintiff's] relationship with another out-of-state entity; placing a 'credit hold' on [plaintiff's] account; and refusing to fulfill normal obligations" but the plaintiff's injury—related to its dealings with its business partners and regulators—was not "tethered to" the forum state "in any meaningful way beyond the fact that [plaintiff's] principal place of business" was in the forum state); *Verbick v. Movement Tech. Co., Inc.*, No. 20-cv-611-TWR (DEB), 2021 WL 6804098, at *8 (S.D. Cal. Mar. 25, 2021) (allegation that defendants intentionally interfered with plaintiff's contract by coordinating with counterparty to force plaintiff to agree—under duress—to release counterparty from liability did not establish express aiming because defendants had no independent contacts with California beyond causing injury to plaintiff there).

By contrast, specific personal jurisdiction in post-*Walden* intentional interference cases tends to lie when a defendant not only allegedly induced the breach but also had additional connections to the forum state beyond the fact of the plaintiff's domicile. *See, e.g.*, *Tresona Multimedia LLC v. Legg*, No. CV-14-02141-PHX-DGC, 2015 WL 470228, at *4 (D. Ariz. Feb. 4, 2015) (allegation that seller of song arrangements induced composer to breach the single-use license he obtained from plaintiff rightsholder so that seller could

re-sell composer's arrangement satisfied express aiming requirement because seller intended to undermine plaintiff's business and compete with plaintiff in Arizona); *Alejandro Fernandez Tinto Pesquera, S.L. v. Fernandez Perez*, No. 20-CV-02128-LHK, 2021 WL 254193, at \*10 (N.D. Cal. Jan. 26, 2021) (defendant expressly aimed conduct into California when he sent cease-and-desist letters into California and interfered with a contract that defendant helped negotiate with the California plaintiff, even though interference affected the California plaintiff's sales in Ohio); *SinglePoint Direct Solar LLC v. Curiel*, No. CV-21-1076-PHX-JAT, 2022 WL 331157, at \*7–8 (D. Ariz. Feb. 3, 2022) (express aiming requirement satisfied when plaintiff alleged that California-based defendant traveled to Arizona to negotiate and execute agreement to acquire company that plaintiff alleged was a vehicle for its former CEO to misappropriate its intellectual property and client lists).

Plaintiff's allegations in the complaint fail to establish that MNA expressly aimed its tortious conduct at Arizona. It has not alleged that MNA had any suit-related contacts with Arizona before inducing MLL to revoke its approval of the agreement: Representatives for MNA had not previously taken part in negotiating the agreement with GPMI or travelled to Arizona as part of the commission of the tort. *Alejandro Fernandez Tinto Pesquera*, 2021 WL 254193, at \*10; *SinglePoint Direct Solar*, 2022 WL 331157, at \*7–8. Nor does Plaintiff allege that MNA intended to become a competitor in Arizona in the market for tire sealant products or that MNA sold any products in Arizona whose sales could have been harmed by Plaintiff's product. *Tresona Multimedia*, 2015 WL 470228, at \*1. As presently alleged, MNA's only pre-tort contact with Arizona is its knowledge that Plaintiff's principal place of business was in Arizona, and that Plaintiff would suffer harm there. (Doc. 1 ¶ 59.) But *Walden* precludes using an individualized targeting theory to establish express aiming. *See Axiom Foods*, 874 F.3d at 1070; *Cayenne*, 2015 WL 5363199, at \*3; *Paragon Bioteck*, 2015 WL 4253996, at \*8; *Indie Caps*, 2021 WL 2352416, at \*1. Therefore, Plaintiff has not alleged that MNA expressly aimed its conduct into Arizona. The Court may not exercise specific jurisdiction over MNA on the facts as

1    alleged in the complaint.  MNA's Motion to Dismiss is granted without prejudice.  Should

2    Plaintiff wish, it may file an amended complaint pleading additional facts relevant to the

3    jurisdictional analysis within **thirty days** of the date this order is filed.

4    **II.     MLL's Motion**

5          MLL argues that the Court lacks personal jurisdiction over it, that the Complaint

6    should be dismissed on grounds of forum non conveniens, and that MLL was improperly

7    served.  (Doc. 28 at 8.)  Because it is dispositive, the Court discusses forum non conveniens

8    only.  *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432

9    (2007) ("A district court therefore may dispose of an action by a forum non conveniens

10   dismissal, bypassing questions of subject-matter and personal jurisdiction, when

11   considerations of convenience, fairness, and judicial economy so warrant.").

12         **A.     Legal Standard**

13         Dismissing a case on forum non conveniens grounds is a drastic remedy, "to be

14   employed sparingly."  *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000).  When

15   there is no forum-selection clause, "a defendant bears the burden of demonstrating an

16   adequate alternative forum, and that the balance of private and public interest factors favors

17   dismissal."  *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011).

18   This burden is met by a "a clear showing of facts which . . . establish such oppression and

19   vexation of a defendant as to be out of proportion to plaintiff's convenience."  *Glob.*

20   *Commodities*, 972 F.3d at 1111 (quoting *Ravelo Monegro*, 211 F.3d at 514).  This is

21   because a "plaintiff's choice of forum is generally entitled to deference, especially where

22   the plaintiff is a United States citizen or resident."  *Ranza v. Nike, Inc.*, 793 F.3d 1059,

23   1076 (9th Cir. 2015).

24         However, when the agreement at issue contains a valid forum selection clause, the

25   clause "[should be] given controlling weight in all but the most exceptional cases."  *Atl.*

26   *Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013)

27   (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J.,

28   concurring)).  The "plaintiff's choice of forum merits no weight" in the analysis; instead,

1   "the plaintiff bears the burden of establishing that transfer to the forum for which the parties

2   bargained is unwarranted." *Id.*  And because a "court . . . must deem the private-interest

3   factors to weigh entirely in favor of the preselected forum," the plaintiff must meet its

4   burden through a showing that the public-interest factors weigh against dismissal. *Id.* at

5   64.  "Because those factors will rarely defeat" a motion to dismiss for forum non

6   conveniens, "the practical result is that forum-selection clauses should control except in

7   unusual cases." *Id.*

8           **B.      Analysis**

9                   **1.      Forum-Selection Clause**

10          The forum-selection clause in the contract between MLL and Plaintiff specifies that

11  for matters not resolved in mediation "each of the Parties hereby submits to the jurisdiction

12  of the competent English courts." (Doc. 1-1 at 28–29.)  As a preliminary matter, the Court

13  must interpret the forum-selection clause in the parties' agreement to determine whether it

14  is mandatory or permissive.  If the provision is mandatory, then the Court is required to

15  give it controlling weight unless the plaintiff shows the specified forum is inadequate and

16  public-interest factors weigh against dismissal. *Atl. Marine*, 571 U.S. at 63–64 (2013).

17  But if the provision is permissive, "the standard approach" to forum non conveniens "is

18  employed." *Magellan Real Est. Inv. Trust v. Losch*, 109 F. Supp. 2d 1144, 1149 (D. Ariz.

19  2000).

20          The parties dispute which body of law should be used to interpret the clause.

21  Plaintiff advocates for the application of federal common law, citing *Manetti-Farrow, Inc.*

22  *v. Gucci America, Inc.*, 858 F.2d 509 (9th Cir. 1988), and a number of district court cases.

23  *See Indoor Billboard Nw. Inc. v. M2 Sys. Corp.*, 922 F. Supp. 2d 1154, 1160–61 (D. Or.

24  2013); *Kiland v. Bos. Sci. Corp.*, No. C 10-4105 SBA, 2011 WL 1261130, at *4 (N.D. Cal.

25  Apr. 1, 2011); *Lavera Skin Care N. Am., Inc. v. Laverana GmbH & Co. KG*, No. 13-cv-

26  2311-RSM, 2014 WL 7338739, at *5 (W.D. Wash. Dec. 19, 2014).  MLL argues that the

27  agreement's choice-of-law provision requires application of English law. *See Martinez v.*

28  *Bloomberg LP*, 740 F.3d 211, 217–18 (2d Cir. 2014) (applying law chosen by parties to

1   interpret forum-selection clause before applying federal law to determine whether clause

2   as interpreted was enforceable).  In *Manetti-Farrow*, the Ninth Circuit held that the *Erie*

3   doctrine required federal courts sitting in diversity to apply federal law to determine

4   whether a forum-selection clause should be enforced.  *Manetti-Farrow*, 858 F.2d at 513.

5   As a corollary, the court stated that "because enforcement of a forum clause necessarily

6   entails interpretation of the clause before it can be enforced, federal law also applies to the

7   interpretation of forum selection clauses." *Id.*  Notably, the contract at issue did not appear

8   to contain a choice-of-law clause.

9        Ninth Circuit cases are unclear as to whether that corollary applies with equal force

10  to contracts that do contain choice-of-law clauses.  The Ninth Circuit has, on occasion,

11  applied federal law to interpret a forum-selection clause when the agreement also contained

12  a choice-of-law clause.  *See Doe 1 v. AOL LLC*, 552 F.3d 1077, 1080–81 (9th Cir. 2009);

13  *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 76 (9th Cir. 1987).  But the

14  Ninth Circuit has also given effect to the choice-of-law clause when considering forum-

15  selection clauses.  *See Colonial Leasing Co. of New England, Inc. v. Pugh Bros. Garage*,

16  735 F.2d 380, 382 (9th Cir. 1984); *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d

17  984, 994 (9th Cir. 2006).  Notably, the Ninth Circuit has never explicitly addressed the

18  impact of a choice-of-law provision on the interpretation of forum-selection clauses.  For

19  the reasons stated below, when the agreement has a forum selection clause and a choice of

20  law provision, the forum selection clause should be interpreted using the law selected by

21  the parties.  Thus, in this case, English law is the appropriate law to use in interpreting the

22  forum selection clause.  Nevertheless, even were this Court to interpret the forum selection

23  clause using federal common law, the result would be the same.

24                          **a.        English Law**

25       In light of the parties agreed-upon choice of law provision, the Court will interpret

26  the forum selection clause using English law.  The *Erie* concerns identified in *Manetti-*

27  *Farrow* cut the opposite direction when the question is how to interpret, rather than enforce

28  forum-selection clauses.  *See Manetti-Farrow*, 858 F.2d at 513.  While enforcement of a

1   forum-selection clause is a primarily procedural issue concerning venue, the interpretation

2   of that same clause is a question of substantive contract law.  The *Erie* doctrine cautions

3   that federal courts should restrain themselves to develop a substantive body of common

4   law only where (1) "a federal rule of decision is 'necessary to protect uniquely federal

5   interests,'" and (2) where "Congress has given the courts the power to develop substantive

6   law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Banco*

7   *Nacional de Cuba v Sabbatino*, 376 U.S. 398, 426 (1964)).

8           While there is a unique federal interest in enforcing forum-selection clauses, there

9   is no similar interest in "overriding parties' contractually chosen body of law in favor of

10  uniform federal rules governing the interpretation of forum selection clauses." *Martinez*,

11  740 F. 3d at 221.  If anything, the federal policy favoring enforcement of forum-selection

12  clauses would support giving effect to the parties' choice of law to interpret the agreement.

13  *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).  Otherwise, the scope and

14  effect of a forum-selection clause, including whether the clause is mandatory or permissive,

15  would hinge on where the action was initially filed, and what body of law that court would

16  apply to interpret the clause.  Here, the parties appear to agree that if the forum-selection

17  clause is interpreted under English law, the clause is mandatory, but that if federal common

18  law is applied, the clause is permissive.  (Doc. 28 at 23); (Doc. 32 at 21.)  Application of

19  federal law to interpret the forum-selection clause's scope would therefore vitiate the

20  clause—despite the parties' prior agreement that English law would govern—and run

21  counter to the Supreme Court's admonition in *The Bremen* that in the context of a "freely

22  negotiated international commercial transaction," forum-selection clauses should be given

23  effect in most circumstances.  407 U.S. at 17.  Consequently, the Court will respect the

24  agreement's choice-of-law clause and apply English law to interpret the forum-selection

25  clause before applying federal law to determine whether the clause should be enforced.

26          England is a signatory to the Hague Convention on Choice of Court Agreements,

27  which, *inter alia*, provides that "a choice of court agreement which designates the courts

28  of one Contracting State or one or more specific courts of one Contracting State shall be

1   deemed to be exclusive unless the parties have expressly provided otherwise." Convention

2   on Choice of Court Agreements, art. 3, June 30, 2005, https://perma.cc/NL96-TMMF.

3   Here, the parties agreed that "[f]or any dispute which has not been resolved through

4   mediation according to the procedure set forth in sub-clause 29.2, each of the Parties hereby

5   submits to the jurisdiction of the competent English courts." (Doc. 1-1 at 29.) Therefore,

6   under English law, the forum selection clause is mandatory absent express indication to the

7   contrary. Because there is no such indication, the Court must construe the clause as

8   mandatory and give it controlling effect unless the public interest factors weigh against

9   dismissal.

10                          **b.      Federal Law**

11          The Court would reach the same result if federal law applied to the interpretation of

12   the forum-selection clause. Under federal law, courts interpreting a contract "look for

13   guidance 'to general principles for interpreting contracts.'" *Doe 1*, 552 F.3d at 1081

14   (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th

15   Cir. 1999)). "Contract terms are to be given their ordinary meaning, and when the terms

16   of a contract are clear, the intent of the parties must be ascertained from the contract itself.

17   Whenever possible, the plain language of the contract should be considered first." *Id.*

18   (quoting *Klamath Water Users Protective Ass'n*, 204 F.3d at 1210). Absent special

19   circumstances, words in the contract will be given their common or normal meaning. *Hunt*

20   *Wesson*, 817 F.2d at 77. A written contract is to be read "as a whole," and each part

21   interpreted "with reference to the whole." *Doe 1*, 552 F.3d at 1081.

22          The section of the agreement that contains the forum-selection clause—labelled "29.

23   Applicable Law – Dispute Settlement"—states that the agreement "shall be governed by

24   and interpreted in accordance with English law. To give effect to every part of the

25   agreement in interpreting the whole, as federal law requires, the forum-selection clause

26   must be interpreted using English law. For the reasons stated above, English law would

27   construe the forum-selection clause as exclusive. (Doc. 1-1 at 28.) Therefore, the forum-

28   selection clause, when read in context, contains clear indicia that the parties intended their

1  choice of forum to be exclusive.  The forum-selection clause is mandatory and must be

2  given effect under either English law or federal law.

3          **2.**        **Adequate Alternative Forum**

4         "An alternative forum ordinarily exists when defendants are amenable to service of

5  process in the foreign forum," and "when the entire case and all parties can come within

6  the jurisdiction of that forum." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir.

7  2002) (quoting *Alpine View Co. Ltd. v. Atlas Copco*, 205 F.3d 208, 221 (5th Cir. 2000)).

8  Because the forum selection clause in this agreement is valid and controlling, Plaintiff

9  bears the burden of showing that England is not an adequate alternative forum.  *See Atl.*

10  *Marine*, 571 U.S. at 63 ("[A]s the party defying the forum-selection clause, the plaintiff

11  bears the burden of establishing that transfer to the forum for which the parties bargained

12  is unwarranted."); *see also In re Facebook, Inc. S'holder Derivative Privacy Litig.*, 367 F.

13  Supp. 3d 1108, 1120 (N.D. Cal. 2019) (finding that "Plaintiffs have not carried their burden

14  of showing" that the selected forum was inadequate when forum selection clause required

15  litigation in the Delaware Court of Chancery); *Finsa Portafolios, S.A. de C.V. v. OpenGate*

16  *Cap., LLC*, No. 17-cv-4630-RGK, 2017 WL 6883687, at *3 (C.D. Cal. Nov. 15, 2017)

17  ("[A]s the party defying a valid forum selection clause, Plaintiffs had the burden to show

18  why Mexico was not an adequate alternative forum."); *Rosenberg v. Viking River Cruises*,

19  No. 19-cv-9691-RGK-AS, 2020 WL 1442886, at *3 (C.D. Cal. Mar. 23, 2020) (requiring

20  Plaintiff to establish why Switzerland was not adequate alternative forum in light of valid

21  forum selection clause); *cf. Azima v. RAK Inv. Auth.*, 926 F.3d 870, 875 (D.C. Cir. 2019)

22  (noting that "we can assume that [the parties] selected [a forum] adequate to litigate their

23  claims and to protect their private interests" when valid forum selection clause applies).

24         Plaintiff's argument that England is inadequate because MNA is not amenable to

25  service of process in England fails.  (Doc. 32 at 22.)  Plaintiff has not provided the Court

26  with any factual or legal support for its claim that MNA is not subject to jurisdiction in

27  England.  Consequently, Plaintiff has not met its burden to show why England is an

28  inadequate alternative forum.  *Atl. Marine*, 571 U.S. at 64; *see Finsa Portafolios*, 2017 WL

1    6883687, at *3 n.3 (denying motion for reconsideration and enforcing valid forum-

2    selection clause because plaintiff failed to meet its burden of establishing that not all

3    defendants would be subject to service of process in designated forum).

4                    **3.        Public Interest Factors**

5            Courts consider the following public interest factors in determining whether to

6    dismiss an action on forum non conveniens grounds: "(1) the local interest in the lawsuit,

7    (2) the court's familiarity with the governing law, (3) the burden on local courts and juries,

8    (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular

9    forum." *Carijano*, 643 F.3d at 1232 (quoting *Bos. Telecomms. Grp., Inc. v. Wood*, 588

10   F.3d 1201, 1211 (9th Cir. 2009)).  Here, the first factor weighs in Plaintiff's favor because

11   Arizona has an interest in affording its residents a forum to seek redress for alleged harms.

12   *See Dole Food*, 303 F.3d at 1119.  However, the parties have agreed to apply English law

13   to their disputes, which weighs in favor of dismissal because English courts have greater

14   experience interpreting and applying English law.  *See Lueck v. Sundstrand Corp.*, 236

15   F.3d 1137, 1148 n.6 (9th Cir. 2001) (determining that likely application of foreign law

16   weighed in favor of dismissal).  As to the third and fourth factors, the District of Arizona

17   is one of the busiest courts in the Ninth Circuit as measured by overall filings.  *See U.S.*

18   *District Courts – Federal Court Management Statistics – Comparison Within Circuit*,

19   Administrative Office of the U.S. Courts, (September 30, 2021), https://perma.cc/V3PD-

20   BNJW.  Granting MLL's motion to dismiss would completely dispose of this case, as the

21   Court has determined it lacks personal jurisdiction over MNA.  Therefore, dismissal would

22   allow the Court to allocate its resources towards other pending matters.  These factors

23   accordingly weigh in favor of dismissal.  Finally, the fifth factor weighs in favor of

24   dismissal.  As a forum, England is related to the dispute because MLL is an English entity.

25           While the first public interest factor weighs against dismissal, all other factors

26   support enforcing the parties' forum selection clause.  Plaintiff's claims against MLL will

27   be dismissed on forum non conveniens grounds, without leave to amend.

28   //

**CONCLUSION**

The Court grants both Motions to Dismiss.  It is possible that Plaintiff's claims against MNA may be appropriately brought in Arizona if it can be supported by proper jurisdictional facts.  The Court therefore grants Plaintiff leave to amend its complaint against MNA within thirty days.  As to MLL, the forum-selection clause in the agreement is mandatory and must be enforced; the Court will not grant Plaintiff leave to amend its claims against MLL in this forum.

**IT IS ORDERED** that MNA's Motion to Dismiss Pursuant to Rule 12(b)(2) for Lack of Personal Jurisdiction (Doc. 27) is **GRANTED.**

**IT IS FURTHER ORDERED** that MLL's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(5) and on Grounds of Forum Non Conveniens (Doc. 28) is **GRANTED.**  The Clerk of Court is directed to terminate this matter as to Michelin Lifestyle Limited ("MLL").

**IT IS FURTHER ORDERED** dismissing Plaintiff's Complaint (Doc. 1) without prejudice.  The Court grants Plaintiff leave to file an amended complaint pleading additional facts relevant to whether the Court has jurisdiction over MNA within **thirty days** of the date this Order.

Dated this 3rd day of March, 2022.

_____
G. Murray Snow
Chief United States District Judge